UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,      15-CR-142-EAW-MJR
                                                  REPORT AND RECOMMENDATION

    -v-

STANLEY OLEJNICZAK,

        Defendant.
_____

This case has been referred to the undersigned by the Hon. Elizabeth A. Wolford pursuant to 28 U.S.C. §636(b)(1) for supervision of pre-trial proceedings and to hear and report on all suppression motions. (*See* Dkt. Nos. 35, 436).

On March 16, 2016, a federal grand jury in the Western District of New York returned a forty-six count Second Superseding Indictment charging sixteen members of the Kingsmen Motorcycle Club with RICO Conspiracy and related firearm, drug trafficking, and violent offenses. (*See* Dkt. No. 33). Defendant Stanley Olejniczak is charged with eight counts: Count 1 (RICO Conspiracy); Count 2 (Possession of Firearms in Furtherance of a Crime of Violence); Count 10 (Hobbs Act Conspiracy); Count 11 (Hobbs Act Robbery); Count 12 (Assault with a Dangerous Weapon in Aid of Racketeering); Count 13 (Use of a Firearm During and in Relation to Crimes of Violence); Count 45 (Using and Maintaining Premises for Drug Dealing); and Count 46 (Possession of Firearms in Furtherance of Drug Trafficking Crime). (*See id.*).

On December 8, 2016, the defendant filed an omnibus pre-trial motion, which includes a motion to suppress evidence seized from his residence at 95 Jones Street, Buffalo, New York on March 22, 2016 pursuant to the execution of a warrant for his arrest. (Dkt. No. 394 at 27-29). More particularly, the defendant seeks to suppress

firearms seized from a firearm safe located in a downstairs bedroom in his residence and a shotgun, ammunition, and marijuana seized from an upstairs bedroom. On February 7, 2017, the Court granted the defendant's request for a hearing on his motion to suppress evidence. (Dkt. No. 486).

The Court held a suppression hearing on March 22, 2017 at which FBI Safe Streets Task Force Officer ("TFO") Michael Maiola testified that the Buffalo Police Department SWAT team assisted with the execution of the arrest warrant at the defendant's residence, that the SWAT team discovered the firearm safe, shotgun, ammunition, and marijuana within the residence, and that the defendant consented to a search of the safe. The parties thereafter filed their post-hearing briefs (*see* Dkt. Nos. 573, 576, 608, 609) and appeared for oral argument on June 6, 2017. After hearing argument on the motion, the Court concluded that the suppression hearing should be reopened to allow a member or members of the SWAT team to testify regarding the discovery of the evidence at issue in the defendant's suppression motion. (*See* Dkt. No. 627). The hearing continued on June 20, 2017, and SWAT team members John Heitzhaus, Michael Pinnavaia, Thomas Stroehlein, Terence Dolan, Thomas Leatherbarrow, and Harvey Frankel testified, as did TFO Maiola, who the government recalled to the stand.[1] On June 22, 2017, Buffalo Police Department SWAT Commander (retired) Vernon Beaty testified, and the government rested.[2] The defendant did not call any witnesses. In total, the Court received the following government exhibits into evidence: 1, 2, 7-9, 11, 15-18, 33, and 36-45. (*See* Dkt. No.

---

[1]   The government proffered on the second day of the hearing that other members of the SWAT team have no specific recollection of the events of March 22, 2016 (Chauncey White III, Daniel Redmond, and Jeff Weyand), did not enter the defendant's residence that day (Michael Eason), or are unavailable to testify (Mark Maraschiello). (T2: 128-31).

[2]   Transcripts of the March 22 (Dkt. No. 551), June 20 (Dkt. No. 653), and June 22, 2017 (Dkt. No. 660) proceedings are designated as T1, T2, and T3, respectively.

645). The parties then filed supplemental post-hearing briefs. (*See* Dkt. Nos. 680, 682).

After considering the evidence adduced at the hearing, the submissions of the parties, and argument from counsel, it is recommended that the defendant's motion to suppress evidence be denied in its entirety.

## **FINDINGS OF FACT**

On March 16, 2016, the Court issued an arrest warrant for the defendant pursuant to the return of the Second Superseding Indictment. (*See* T1: 7; Ex. 1). The next day, the FBI conducted a case briefing regarding the planned arrests of the defendant and several other individuals named in the indictment. (T2: 5-6). TFO Maiola, the team leader responsible for the arrest of the defendant, and Commander Beaty, the commander of the SWAT team responsible for entering and securing the defendant's residence pursuant to the execution of the arrest warrant, attended the FBI briefing. (T2: 5; T3: 6-7, 15-16). At the conclusion of the briefing, TFO Maiola and Commander Beaty met to specifically discuss the risks associated with arresting the defendant, including the FBI's assessment that the defendant should be considered armed and dangerous, the defendant's criminal convictions, including one for attempted assault, the defendant's prior arrest for assault, the defendant's involvement in a stabbing and a violent incident in Springville, New York, and the defendant's membership in the Kingsmen Motorcycle Club. (T2: 7-11; T3: 16-19, 22-24; Exs. 36, 37, 44, 45). In preparation for the defendant's arrest, TFO Maiola surveilled the defendant's residence at 95 Jones Street, determined it was a single-family home, and confirmed with a government agency that the defendant received services at that

address. (T1: 7-8, 13). The day before the arrest, the Court signed a search and seizure warrant authorizing a search of 95 Jones Street for the defendant's person. (T1: 10-11; Ex. 2).

Commander Beaty drove past 95 Jones Street on the morning of the arrest and observed the defendant's pickup truck in the driveway. (T3: 19-21, 28). Between 4:15 and 4:30 a.m., Commander Beaty briefed the SWAT team regarding the risks he and TFO Maiola had previously discussed. (T3: 29-32). The SWAT team consisted of four sub-teams: (1) a two-person breaching team responsible for making entry into the defendant's residence; (2) a seven-person entry team in charge of sweeping and securing the residence; (3) a two-person "hands-on" team responsible for handcuffing any persons found inside the residence; and (4) a two-person team that remained outside the residence to provide "security." (T2: 28-29, 56, 130-31; Ex. 36).

The SWAT team arrived at 95 Jones Street shortly before 6:00 a.m. (T3: 33). Commander Beaty positioned himself outside the defendant's residence and stayed in direct radio communication with his team members after they entered the residence. (T2: 38; T3: 12-13, 33-36). The SWAT team's objective was to enter and secure the residence before turning it over to TFO Maiola, who was waiting down the street. (T2: 16-17, 29-31, 36-37, 61, 93-94, 103, 113-15, 125-27; T3: 9). Securing the residence means securing "bodies," *i.e.*, any persons within the residence. (T3: 9). It does not mean searching for evidence. (T2: 36-37, 61-62, 94, 106-07, 127).

At approximately 6:01 a.m., TFO Maiola directed the SWAT team to enter the defendant's residence. (T1: 13-14). Officers Pinnavaia and Stroehlein served on the breaching team that day and were thus responsible for making entry into the residence.

(T2: 62).  Officer Pinnavaia testified that after the SWAT team announced "Buffalo police search warrant" and started opening the front door to the residence, Meredith Moore, the defendant's girlfriend, opened the door.  (T2: 62-63).  Officer Pinnavaia further testified that he and Officer Stroehlein moved Ms. Moore out of the way and that Officer Stroehlein secured Ms. Moore.  (T2: 63-64).  Commander Beaty provided conflicting testimony in this regard, testifying that it was Officer White who first encountered Ms. Moore and that Officers Pinnavaia and Stroehlein had to use a battering ram to breach the front door.  (T3: 42-44).  This conflicting testimony does not affect the Court's analysis of the defendant's motion.

Upon entering the residence, the SWAT entry team "flood[ed]" the house looking for bodies.  (T2: 69, 107).  It is the SWAT team's procedure to clear a residence room-by-room.  (T2: 69-70).  Put another way, a team member will not pass a room that has not yet been entered and cleared by another member of the team.  (*Id.*).  In the course of clearing the first floor of the defendant's residence, the SWAT team entered a bedroom located off of a dining-room area in the middle of the first floor and observed a large firearm safe.  (T2: 64, 68-71, 79-80).  A team member stayed with the safe until the rest of team finished securing the residence.  (T3: 39, 46).  SWAT team members soon advised Commander Beaty that the team was moving upstairs.  (T3: 36-37).  Commander Beaty then heard members call out over the radio "[l]et me see your hands[,] [l]et me see your hands."  (T3: 37).  A SWAT team member then called out that the team had an individual in custody in an upstairs bedroom in the rear of the house, and, further, there was a weapon in the room.  (T3: 37, 47, 66-67).  The individual in custody was the defendant, who was found in bed.  (T3: 47; Ex. 7).  Next to him were a

loaded shotgun, ammunition, and marijuana.  (T1: 15-16, 25; T3: 37-39, 66-67; Exs. 7, 9, 11, 15, 16).  After completing its initial sweep of the residence, the SWAT team conducted a secondary sweep.  (T3: 37-38).  The secondary sweep is a standard SWAT procedure pursuant to which team members double-check the efforts of their fellow team members to make sure that no one else is inside the residence and the residence is completely secure.  (T3: 10-12, 25-26).  The SWAT team completed both the initial and secondary sweeps within five minutes of entering the residence.  (T2: 41, 45).

After Commander Beaty heard "[s]econdary complete" over the radio, he entered the premises and began obtaining information from Ms. Moore, who was seated near the front door.  (T3: 38, 58-59).  Commander Beaty observed the SWAT team bring the defendant down the stairs to the first floor.  (T3: 38).  It was around this time that a SWAT team member advised Commander Beaty about the firearm safe.  (T3: 39).  The room containing the safe is approximately ten feet by twelve feet; the safe was in "plain view" in the far corner of the room.  (T2: 79-80).  The record does not indicate who from the SWAT team informed Commander Beaty about the safe or which team member first observed the safe.  Commander Beaty then stepped outside the residence and briefed TFO Maiola on the SWAT team's findings.  (T1: 15; T3: 58-60).

TFO Maiola entered the residence at approximately 6:10 a.m. and presented the arrest and search warrants to the defendant.  (T1: 14-15, 22-23; Exs. 1, 2).  TFO Maiola also visited the upstairs bedroom and observed the shotgun, ammunition, and marijuana next to the defendant's bed.  (T1: 15-16, 23, 26; Exs. 9, 11, 15, 16).  He photographed the items, documented the location in which they were discovered, and

brought them downstairs. (T1: 15-16, 23, 26; Exs. 9, 11, 15, 16). TFO Maiola observed the firearm safe as well. (T1: 15). TFO Maiola then contacted an Assistant United States Attorney ("AUSA") about the safe, and the AUSA instructed TFO Maiola to ask the defendant for his consent to search the safe and to explain to the defendant that the government would apply for a search warrant in the event he withheld his consent. (T1: 16-18). Pursuant to these instructions, TFO Maiola gave the defendant a Consent to Search form, read the form to him word-for-word, and asked him to consent to a search of the safe. (T1: 18-21; Ex. 8). TFO Maiola advised the defendant that he did not have to consent to the search and that the government could instead apply for a search warrant, but he cautioned the defendant that the government might damage the safe if it had to open it pursuant to a warrant. (T1: 19, 42, 46-47). TFO Maiola further advised the defendant that the defendant would receive a property receipt for any items seized from the safe that day. (T1: 19, 42).

The defendant, who was handcuffed in the front of his body and seated at a table in the dining-room area, confirmed that he understood the situation and proceeded to sign the Consent to Search form. (T1: 18-19, 46-47; Ex. 8). At this point in time only TFO Maiola and one other law enforcement officer were in the dining-room area with the defendant. (T1: 48). Neither TFO Maiola nor the other officer attempted to secure the defendant's consent through threats or physical force. (T1: 47).

After the defendant signed the Consent to Search form, law enforcement escorted him to the safe so that he could enter the combination code to open it. (T1: 22). Once the safe was open, TFO Maiola observed and photographed ten firearms stored within it. (T1: 30-32; Exs. 7, 17, 18, 33). TFO Maiola seized the firearms and

drafted a property inventory receipt, which he gave to Ms. Moore.  (T1: 32-33; Ex. 33).  Approximately two weeks later, TFO Maiola prepared a FBI 302 report documenting the defendant's arrest and the seizure of evidence.  (T1: 33-34; Ex. 7).

The Court finds all of the witnesses who testified at the suppression hearing to be credible.  Although some witnesses gave slightly different accounts regarding the entry and sweep of the defendant's residence, or could not specifically recall entering and sweeping the residence, this is not surprising given that the SWAT team performs "a couple hundred" entries each year.  (T2: 47, 70, 102).  Any discrepancies in the hearing testimony are insignificant and do not affect the Court's analysis of the defendant's motion to suppress.

## **CONCLUSIONS OF LAW**

The defendant moves to suppress the ten firearms seized from the firearm safe in the downstairs bedroom and the shotgun, ammunition, and marijuana seized from the upstairs bedroom.  The government argues that although it did not have a search warrant to search the defendant's residence for this evidence, the evidence should not be suppressed because the SWAT team discovered it while searching for the defendant and securing his residence pursuant to the arrest warrant, the defendant voluntarily consented to a search of the firearm safe, and TFO Maiola permissibly seized the evidence under the plain view doctrine.  The Court will address each of the government's arguments in turn.

### I.  *Search of the Defendant's Residence*

The Fourth Amendment protects "[t]he right of the people to be secure in their person, houses, papers and effects, against unreasonable searches and seizures."

U.S. Const. amend. IV. "Because the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed, it is a basic principle of Fourth Amendment law that searches inside a home without a warrant are presumptively unreasonable." *United States v. Hassock*, 631 F.3d 79, 84 (2d Cir. 2011) (internal quotation marks, citations, and alteration omitted). Nonetheless, the Supreme Court in *Maryland v. Buie* identified three types of searches that may be performed without a search warrant during the course of an in-home arrest. 494 U.S. 325 (1990); *see also United States v. Moran Vargas*, 376 F.3d 112, 115 (2d Cir. 2004) (describing the three types of *Buie* searches). "First, when an arrest is initiated based on a warrant and probable cause to believe that the target is within the premises, officers are 'entitled to enter and to search anywhere in the house in which [the arrestee] might be found. Once he [is] found, however, the search for him [is] over, and there [is] no longer that particular justification for entering any rooms that ha[ve] not yet been searched.'" *Moran Vargas*, 376 F.3d at 115 (alterations in original) (quoting *Buie*, 494 U.S. at 333); *see also United States v. Delva*, 858 F.3d 135, 148 (2d Cir. 2017) ("Law enforcement authorities generally do not need a search warrant to enter a suspect's home when they have an arrest warrant for the suspect, as 'an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.'") (quoting *Payton v. New York*, 445 U.S. 573, 603 (1980)). Second, "because of the risks inherent in taking an individual into custody, officers are automatically justified in searching as 'an incident to the arrest' the area adjoining the place of arrest 'from which an attack could be immediately launched.'" *Id.* (quoting *Buie*, 494 U.S. at 334). Third, "for officers to

search further in a protective sweep, 'there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id.* (quoting *Buie*, 494 U.S. at 334).

Here, the government has shown by a preponderance of the evidence that the SWAT team discovered the firearm safe, shotgun, ammunition, and marijuana while performing the first type of search identified in *Buie*. *See United States v. Long Huang You*, 198 F. Supp. 2d 393, 397 (S.D.N.Y. 2002) ("Once a defendant establishes a basis for a suppression motion, the government must prove that the search was proper by a preponderance of the evidence."). First, the government has shown that the SWAT team had probable cause to believe that the defendant was inside 95 Jones Street on the morning of his arrest. In particular, soon after the Court issued an arrest warrant for the defendant, TFO Maiola surveilled 95 Jones Street, concluded it was a single-family home, and confirmed with a government agency that the defendant received services at that address. On the morning of the arrest, Commander Beaty drove past 95 Jones Street and observed the defendant's pickup truck in the driveway, thus indicating to him that the defendant was home. Given that Commander Beaty and his team arrived at the defendant's residence an hour or two later, around 6:00 a.m., Commander Beaty had probable cause to believe that the defendant was inside 95 Jones Street immediately before the SWAT team made entry.

Second, the government has shown that the SWAT team discovered the evidence while searching for the defendant in his residence. Upon entering the residence, the SWAT team members fanned out searching for "bodies," including that of

the defendant. In the course of this search, the SWAT team observed a firearm safe in the downstairs bedroom. Although no witness could recall at the hearing who from the SWAT team first observed the safe, it is the SWAT team's procedure to clear a residence room-by-room. Therefore, someone from the SWAT team had to have entered the downstairs bedroom and observed the safe before other team members made their way upstairs and found the defendant in the rear bedroom.

The defendant argues, however, that the SWAT team did not find the safe until after it had completed its search for the defendant because Officer Pinnavaia testified that he observed the safe in the downstairs bedroom around the time the defendant was brought downstairs in handcuffs. The defendant's argument overlooks that Officer Pinnavaia further testified that someone from the SWAT team had already secured the downstairs bedroom by the time he observed the safe:

> Q. With respect to the room that you described seeing the gun safe in, did you double check that? Or what did you observe when you went in that room? How far in did you go?
>
> A. I just stepped into the doorway and just looked from the doorway, because it — *by the time I was in that middle room with the [defendant], the initial flooding of the house, the initial searching was over. It had already been searched. Everything was searched.* [The defendant] was coming down. We were just simply at that point waiting for the detectives to come in.

(T2: 70-71) (emphasis added); (*see also* T2: 85) ("Someone from that entry team absolutely would have checked that room before they passed the open door."). Because someone from the SWAT team had already secured the downstairs bedroom and observed the safe, Officer Pinnavaia's own observation of the safe sometime thereafter is not relevant under the *Buie* analysis.

With regard to the shotgun, ammunition, and marijuana, because this evidence was located right next to the defendant in the upstairs bedroom, the SWAT team discovered it at the same time it discovered the defendant. Therefore, like the firearm safe, the SWAT team discovered the shotgun, ammunition, and marijuana while searching for the defendant.

In sum, the SWAT team discovered the firearm safe, shotgun, ammunition, and marijuana while searching for the defendant. Therefore, under *Buie*, the search did not violate the Fourth Amendment. *See Buie*, 494 U.S. at 333; *Moran Vargas*, 376 F.3d at 115. Given this conclusion, the Court need not reach the government's alternative arguments that the SWAT team discovered the firearm safe, shotgun, ammunition, and marijuana pursuant to the second and third types of *Buie* searches.

  II. <u>*The Defendant's Consent to Search the Firearm Safe*</u>

The government did not have a search warrant to search the firearm safe in the downstairs bedroom. "[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (alteration in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). "One such exception is a search that has been consented to . . . ." *United States v. Sanchez*, 635 F.2d 47, 58 (2d Cir. 1980). "For such a consent to be valid, however, it must be voluntarily and freely given. It may not be the product of duress or coercion, flagrant or subtle . . . ." *Id.* The government bears the burden of proving by a preponderance of the evidence that the defendant's consent was in fact voluntarily given. *United States v. Isiofia*, 370 F.3d 226, 230 (2d Cir. 2004). The government cannot meet this burden "by

only showing [the defendant's] acquiescence to a claim of lawful authority." *United States v. Ruiz-Estrella*, 481 F.2d 723, 727 (2d Cir. 1973).

Voluntariness "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. "Relevant considerations include, but are not limited to, the age of the subject, his level of education and intelligence, and whether he was deprived of food or sleep or subjected to other physical abuse." *Sanchez*, 635 F.2d at 58. Where, as here, the defendant was in custody when he consented to the search, the Court must be "particularly sensitive to the heightened possibilities for coercion," *id.* (quoting *Schneckloth*, 412 U.S. at 240 n.29), "but the fact of custody alone does not mean that a consent to search was coerced," *id.* "[W]hether guns were drawn or the consenting individual was frisked, or whether the consenting individual was threatened, was in a public area, or was informed that he had the option of refusing consent to the search," are relevant factors to consider when the defendant consented to the search while in custody. *United States v. Puglisi*, 790 F.2d 240, 243-44 (2d Cir. 1986) (internal citations omitted).

Turning to the characteristics of the defendant, the defendant was fifty-one years old on the day of his arrest. (*See* Ex. 44). He was not a newcomer to the law, having been convicted of harassment, aggravated harassment, attempted assault, disorderly conduct, and criminal contempt before his arrest. (*See id.*); *see United States v. Calvente*, 722 F.2d 1019, 1023 (2d Cir. 1983) (citation omitted) (relying on the defendant's two prior criminal convictions to support a finding of voluntary consent). However, the defendant did not graduate from high school, and he struggles with reading comprehension due to injuries he suffered in an automobile accident in his

youth. (Dkt. No. 552 at 31-38, 42-43).[3] For example, the defendant's father testified in support of the defendant's motion for release from custody that when the defendant sat for his driver's license and hunting permit tests, someone had to read the questions to the defendant and write down his answers for him. (*Id.* at 52-54). The defendant's father also testified, however, that his son passed both tests, that he is "no idiot," that he held a job that required him to drive different routes throughout Western New York, and that he can shoot, load, and aim a firearm. (*Id.* at 45-47, 53-55). Viewed in its entirety, the defendant's father's testimony shows that the defendant is capable of understanding and answering the questions that are asked of him, including TFO Maiola's question about consenting to a search of the firearm safe. Thus, the defendant's characteristics indicate that he voluntarily consented to the search of the safe.

The surrounding circumstances likewise indicate that the defendant voluntarily consented to the search of the safe. TFO Maiola did not use trickery, coercion, deceit, or physical force to secure the defendant's consent; rather, TFO Maiola simply advised the defendant that he did not have to consent to the search of the safe and that the government could instead apply for a search warrant. *See United States v. Faruolo*, 506 F.2d 490, 495 (2d Cir. 1974) ("In our view, . . . the well founded advice of a law enforcement agent that, absent a consent to search, a warrant can be obtained does not constitute coercion. There is an admission by the officer that he has no right to proceed unless the defendant consents."); *see also Calvente*, 722 F.2d at 1023 ("[A]dvising a person of the fact that a search warrant can be obtained does not constitute coercion."); *Sanchez*, 635 F.2d at 59 ("[W]e have upheld findings of valid

---

[3] Docket Number 552 is the transcript of the August 18, 2016 proceeding on the defendant's motion for release from custody.

consent where the defendant was detained for questioning for a brief period in a public place and informed that he had the option of refusing consent pending the agents' seeking a search warrant."). After hearing from TFO Maiola, the defendant weighed his options and decided to consent to the search. The Consent to Search form signed by the defendant indicates that he made this decision voluntarily after being advised of his right to withhold his consent. (Ex. 8). For all of these reasons, the defendant voluntarily consented to the search of the safe, thereby rendering his consent valid.

### III. *The Plain View Seizure of Evidence*

The government argues that the plain view doctrine authorized TFO Maiola to seize the firearms from the firearm safe in the downstairs bedroom and the shotgun, ammunition, and marijuana from the upstairs bedroom. Under the plain view doctrine, "if police are lawfully in a position from which they can view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Each of these requirements is met here.

The SWAT team lawfully observed and accessed the shotgun, ammunition, and marijuana in the upstairs bedroom. (*See supra* Point I). Contrary to the defendant's argument, nothing in the record suggests that the SWAT team or TFO Maiola moved this evidence into plain view. The SWAT team also lawfully observed the firearm safe in the downstairs bedroom (*see id.*), and TFO Maiola lawfully accessed the firearms within the safe with the defendant's consent (*see supra* Point II). The incriminating nature of the shotgun, ammunition, marijuana, and firearms in the firearm safe was immediately apparent to TFO Maiola because he knew that the defendant had been charged with

drug and firearm offenses. (T1: 10, 40-41; Ex. 2); *see United States v. Gamble*, 388 F.3d 74, 76-77 (2d Cir. 2004). In addition, with respect to the firearms in the firearm safe, the Consent to Search form authorizes TFO Maiola to "take any items which [he] determine[s] may be related to [his] investigation." (Ex. 8). Accordingly, TFO Maiola lawfully seized the shotgun, ammunition, marijuana, and ten firearms under the plain view doctrine, and no basis exists to suppress any of this evidence.[4]

## CONCLUSION

For the foregoing reasons, it is recommended that the defendant's motion to suppress evidence (Dkt. No. 394) be denied in its entirety.

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Wolford, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 59(b), 45(a), and 45(c) of the Federal Rules of Criminal Procedure, and Local Rule of Criminal Procedure 59. Any requests for an extension of this deadline must be made to Judge Wolford.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

---

[4] Given the Court's recommendation to deny suppression, it need not address the government's alternative argument that the cost of applying the exclusionary rule outweighs the benefits.

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

Pursuant to Local Rule of Criminal Procedure 59(c)(2), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**SO ORDERED**.

Dated:	August 2, 2017
	Buffalo, New York

			*/s/ Michael J. Roemer*
			MICHAEL J. ROEMER
			United States Magistrate Judge