

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

STANLEY OLEJNICZAK,

           Defendant.

**DECISION AND ORDER**

1:15-CR-00142 EAW

---

## BACKGROUND

The above-captioned matter involves 12 remaining defendants[1] named in a 46-count Second Superseding Indictment (Dkt. 33) returned on March 16, 2016, alleging various crimes, including a conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.*, in connection with the operation of the Kingsmen Motorcycle Club.

On August 2, 2017, United States Magistrate Judge Michael J. Roemer, to whom various pretrial matters had been referred pursuant to 28 U.S.C. § 636(b)(1), including a motion to suppress that had been filed by defendant Stanley Olejniczak ("Defendant") (Dkt. 394), issued a Report and Recommendation ("R&R") recommending that the motion to suppress be denied (Dkt. 709). Defendant had moved to suppress firearms seized from a safe located in a downstairs bedroom, and a shotgun, ammunition, and marijuana seized

---

[1] Four defendants—Edgar Dekay, II a/k/a Ed a/k/a Special Ed (Dkt. 412), Thomas Koszuta a/k/a Kazoo (Dkt. 296), Emmett Green (Dkt. 257), and Ryan Myrtle (Dkt. 330)—have pleaded guilty.

from an upstairs bedroom, during the execution of a warrant to arrest Defendant at his residence on March 22, 2016. (Dkt. 394).

Magistrate Judge Roemer recommended denial of the suppression motion and made the following findings. (Dkt. 709 at 3). First, Magistrate Judge Roemer found that the Government had shown by a preponderance of the evidence that on March 22, 2016, the SWAT team discovered the evidence at issue while searching for Defendant pursuant to a lawful arrest warrant, as authorized by *Maryland v. Buie*, 494 U.S. 325, 333 (1990) (holding that law enforcement possessing an arrest warrant and probable cause to believe that the subject of the warrant is in the home "were entitled to enter and to search anywhere in the house in which [the subject] . . . might be found," but "[o]nce he was found, . . . the search for him was over, and there was no longer that particular justification for entering any rooms that had not yet been searched"). (*Id.* at 8-12). Second, Magistrate Judge Roemer found that the Government established by a preponderance of the evidence that Defendant voluntarily consented to the search of the firearm safe. (*Id.* at 12-15). Third, Magistrate Judge Roemer found that the evidence was lawfully seized under the plain view doctrine, and no basis exists to suppress any of the evidence. (*Id.* at 15-16).

On August 25, 2017, Defendant filed objections to the R&R. (Dkt. 758). The Government filed papers in opposition to the objections on September 11, 2017 (Dkt. 770), and Defendant filed a reply on September 18, 2017 (Dkt. 795). Oral argument was held before the undersigned on September 21, 2017, at which time the Court reserved decision. (Dkt. 800).

## ANALYSIS

This Court reviews Defendant's objections under a *de novo* standard. Fed. R. Crim. P. 59(b)(3); *see also* 28 U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."); *United States v. Male Juvenile*, 121 F.3d 34, 38 (2d Cir. 1997) (requiring a district court to make *de novo* determinations to the extent that a party makes specific objections to a magistrate judge's findings).

Defendant's challenges to the R&R focus on the factual findings made by Magistrate Judge Roemer. Defendant challenges the credibility determinations made by Magistrate Judge Roemer, particularly with respect to Vernon Beaty, the Commander of the SWAT team who entered Defendant's residence to execute the arrest warrant. (*See, e.g.*, Dkt. 758 at 19 (claiming that Beaty's "testimony was incredible at times and as a whole not worthy of belief"), 20 (claiming that Beaty's testimony was "fabricated testimony by someone who doesn't remember what happened in this incident"); Dkt. 795 at 2 (referring to Beaty's testimony as "crazy" and revealing that "he had no idea what happened here and tailored his testimony to fit the needs of the Government")).

Although this Court's review is *de novo*, it must give appropriate deference to the credibility determinations made by the magistrate judge who heard the witness testimony in this case. *See United States v. Lawson*, 961 F. Supp. 2d 496, 499 (W.D.N.Y. 2013) ("The Second Circuit has instructed that where a Magistrate Judge conducts an evidentiary hearing and makes credibility findings on disputed issues of fact, the district court will ordinarily accept those credibility findings."); *see also United States v. Raddatz*, 447 U.S.

667, 675-76 (1980) (district court is not required to rehear witness testimony when accepting a magistrate judge's credibility findings). Magistrate Judge Roemer found "all of the witnesses who testified at the suppression hearing to be credible," and any discrepancies in the testimony were neither significant nor surprising given the number of SWAT team entries conducted each year. (Dkt. 709 at 8).

This Court has reviewed the entire transcript of the three-day hearing[2] before Magistrate Judge Roemer, and the record in this case fully supports Magistrate Judge Roemer's factual findings. Defendant's papers in support of his objections make a valiant effort to pick out portions of the testimony in support of his version of events on the date in question. However, Magistrate Judge Roemer considered the testimony of the various law enforcement witnesses who entered the residence on the date in question and, making fair inferences from their testimony, concluded that the evidence at issue was observed in plain view during the lawful entry into the home to execute the arrest warrant. After this Court's *de novo* review, it agrees with Magistrate Judge Roemer's conclusions and adopts

---

[2] After one hearing day of testimony and following argument on the motion to suppress, Magistrate Judge Roemer "concluded that the suppression hearing should be reopened to allow a member or members of the SWAT team to testify regarding the discovery of the evidence at issue in the defendant's suppression motion." (Dkt. 709 at 2). Defendant criticizes the reopening of the hearing in his objections. However, "[t]he decision whether to reopen a suppression hearing lies within the Court's discretion." *United States v. Rosa*, No. 5:07-CR-443, 2008 WL 4280088, at *1 (N.D.N.Y. Sept. 15, 2008) (citing *United States v. Bayless*, 201 F.3d 116, 131-32 (2d Cir. 2000)); *see also In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 177, 196 (2d Cir. 2008) (reviewing district court's decision to reopen a suppression hearing for abuse of discretion). Here, it was well within Magistrate Judge Roemer's exercise of discretion to reopen the hearing.

the R&R in its entirety. The Court will not repeat the full extent of Magistrate Judge Roemer's findings as set forth in the R&R, with which familiarity is assumed, but it does address a few of the points raised by Defendant.

As an initial matter, the evidence elicited during the three days of testimony established that upon entering the residence, the SWAT team "flooded" the house looking for bodies, and it is their procedure to clear a residence room-by-room. While many of the members of the SWAT team had difficulty recalling specifics about this particular arrest, the testimony established that they conduct hundreds of similar procedures annually, and the practices they follow are regimented and consistent, as required to ensure their own safety and the safety of others during these procedures.

With respect to the discovery of the gun safe on the first floor, Magistrate Judge Roemer concluded as follows:

> In the course of clearing the first floor of the defendant's residence, the SWAT team entered a bedroom located off of a dining-room area in the middle of the first floor and observed a large firearm safe. (T2: 64, 68-71, 79-80). A team member stayed with the safe until the rest of the team finished securing the residence. (T3: 39, 46).

(Dkt. 709 at 5). Defendant contests this finding, suggesting that the gun safe in the downstairs bedroom was not discovered until after Defendant was taken into custody and Officer Pinnavaia (a member of the SWAT team's breaching team that day) "meandered" into the downstairs bedroom and discovered the gun safe. (Dkt. 758 at 11-12). According to Defendant, after he was secured and placed in the dining room, Officer Pinnavaia had a conversation with Defendant about hunting and "then [Officer Pinnavaia] strolled off on his own into a room, put his head into it, shined a flashlight into the deep corner, and saw

- 5 -

a gun safe." (*Id.* at 15). Defendant continues: "Pinnavaia . . . went on a frolic after the house was cleared by the protective sweep and after the securing of the target of the arrest warrant. He wandered into a room, shined a flashlight, and found a safe in the corner." (*Id.* at 23).

This Court does not agree with Defendant's interpretation of the testimony. Officer Pinnavaia appeared to have a more specific recollection of his observations of the gun safe than some other members of the SWAT team, but he never testified that he was the one who discovered the safe. Others were aware of the gun safe in addition to Officer Pinnavaia (T2[3] at 68, 71), and other members of the SWAT team had "[a]bsolutely" entered into the room with the gun safe when the house was initially flooded. (*Id.* at 69). In other words, it was general knowledge that a gun safe was present in the first floor bedroom and in plain view. (*Id.* at 71-72, 79-80). As acknowledged by Magistrate Judge Roemer in his findings, the record does not indicate "which team member first observed the safe" (Dkt. 709 at 6), but that does not diminish the credible evidence establishing that the SWAT team discovered the gun safe during its initial sweep of the residence, and thus, it was in plain view. In other words, the fact that Officer Pinnavaia observed the safe after the initial flooding was completed (T2 at 71) does not mean that he was the one who discovered the safe—he never testified to that effect, and there is no testimony indicating that he was the one who discovered the safe. Instead, Commander Beaty testified that whoever discovered the safe stayed with the safe, and its discovery was reported to him when he entered the

---

[3] Transcripts of the March 22 (Dkt. 551), June 20 (Dkt. 653), and June 22, 2017 (Dkt. 660) proceedings are designated as T1, T2 and T3, respectively.

- 6 -

residence. (T3 at 38-39, 46, 54-55, 58-59). In fact, Commander Beaty testified that the gun safe was reported to him at the same time that Defendant was being brought down from upstairs (*id.* at 38-39), thus contradicting Defendant's argument that, somehow, the safe was first discovered by Officer Pinnavaia after Defendant was sitting downstairs in the dining area and secured.

Defendant also contends that law enforcement did not have the authority to conduct a general sweep of the residence because they did not have a reasonable belief that any person would be inside that would pose a danger to them. (Dkt. 758 at 6). Not only does the record fully support law enforcement's conclusion that Defendant may be armed and dangerous based on his alleged gang affiliation, criminal history, and grand jury findings in this case, but Defendant's argument ignores law enforcement's possession of a warrant for Defendant's arrest and a search warrant to enter Defendant's residence and search for his body. (*See* Gov't Ex. 1; Gov't Ex. 2). Defendant's reliance upon cases dealing with warrantless searches in support of this portion of his argument is misplaced. (*See* Dkt. 758 at 6-8 (citing *United States v. Hassock*, 631 F.3d 79, 88 (2d Cir. 2011) ("But a protective sweep is reasonable only to safeguard officers in the pursuit of an otherwise legitimate purpose. Where no other purpose is being pursued, a sweep is no different from any other search and, therefore, requires a warrant, exigency, or authorized consent, none of which were present here."); *United States v. Gandia*, 424 F.3d 255, 262 (2d Cir. 2005) ("[W]hen police have gained access to a suspect's home through his or her consent, there is a concern that generously construing *Buie* will enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search of the home."); *United States v. Moran*

*Vargas*, 376 F.3d 112, 116 (2d Cir. 2004) (addressing government's claim of protective sweep when gaining entry for purposes of conducting non-custodial interview through consent)).

Defendant further disputes Magistrate Judge Roemer's findings that Defendant was discovered and taken into custody in the upstairs bedroom. (Dkt. 709 at 5-6 (finding that Defendant was found upstairs in bed, and "[n]ext to him were a loaded shotgun, ammunition, and marijuana")). Defendant contends that, instead, he "wandered down and was encountered in the kitchen. . . ." (Dkt. 758 at 25). Again, the testimony simply does not support Defendant's suggested version of events. Instead, the record establishes that Defendant was discovered upstairs in the bedroom with a shotgun, marijuana, and ammunition in plain view next to the bed. (T1 at 15-16, 25; T2 at 66, 82; T3 at 37-39, 47, 66-67).

Finally, Defendant challenges Magistrate Judge Roemer's finding that Defendant voluntarily consented to the search of the safe and that his consent was valid. Defendant contends that Magistrate Judge Roemer "omitted analysis of the testimony of the defendant's father which was offered for the detention hearing concerning his mental capabilities." (Dkt. 758 at 6). That is incorrect, as Magistrate Judge Roemer did consider Defendant's father's testimony, but concluded that "[v]iewed in its entirety, the defendant's father's testimony shows that the defendant is capable of understanding and answering the questions that are asked of him, including [Task Force Officer ("TFO")] Maiola's question about consenting to a search of the firearm safe." (Dkt. 709 at 14).

TFO Maiola testified about the consent that was rendered by Defendant:

> Q   Describe your interaction with Mr. Olejniczak at that point.
>
> A   I informed him that there was the safe in the downstairs bedroom and I asked for his consent to open it. I provided him with the Consent to Search form. I let him know that we were going to start process for a search warrant and that if we did get a search warrant, the way the safe would be opened would probably damage it. It was nice safe, so I didn't think we would want it damaged.
> Also, I told him if the Consent to Search form was signed, that he would be able to see everything in the safe as we opened it while we were there. And if anything was to be taken or seized, he would be able to see that and he would have the receipt right there. It wouldn't happen after-the-fact when he wasn't present.
>
> Q   What did Mr. Olejniczak say when you explained that to him?
>
> A   He understood that and he signed the Consent to Search form.

(T1 at 19). TFO Maiola further testified that Defendant "could understand what I was saying and he answered me accordingly." (*Id.* at 47). When Defendant signed the consent form, he was handcuffed in the front of his body and seated at a table in the dining room area. (*Id.* at 18-19).

Magistrate Judge Roemer conducted a thorough analysis of the facts involving Defendant's consent in view of the relevant law. (Dkt. 709 at 12-15). Based upon this Court's *de novo* review, and a consideration of the totality of all the circumstances, as outlined in great detail in the R&R, the Court agrees with Magistrate Judge Roemer that the Government established by a preponderance of the evidence that Defendant voluntarily consented to a search of the gun safe.

## CONCLUSION

The Court has conducted a thorough review of the R&R, the parties' filings before this Court and Magistrate Judge Roemer, and the transcripts of the three days of testimony

before Magistrate Judge Roemer. In addition, it has considered the arguments advanced by counsel at the oral argument held before the undersigned on September 21, 2017. After a *de novo* review, the Court hereby accepts and adopts the R&R (Dkt. 709) and overrules Defendant's objections (Dkt. 758). Accordingly, for the reasons set forth above and in the R&R, Defendant's motion to suppress (Dkt. 394) is denied.

SO ORDERED.

ELIZABETH A. WOLFORD
United States District Judge

Dated: November 15, 2017
Rochester, New York